JUSTICE REGNIER
delivered the Opinion of the Court.
¶1 Appellants filed an action in the First Judicial District Court, Lewis and Clark County, seeking a declaratory judgment that the Montana University System’s policy prohibiting employees from receiving dependent insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution. The Montana University System filed a Motion to Dismiss, which the District Court granted.
¶2 The sole issue raised on appeal is whether the Montana University System’s policy prohibiting gay employees from receiving insurance *151 coverage for their same-sex domestic partners violates their rights under the Montana Constitution.
¶3 We reverse the District Court.
BACKGROUND
¶4 Carol Snetsinger and Nancy Siegel are same-sex domestic partners, as are Carla Grayson and Adrianne Neff. Snetsinger and Grayson are employees of the Montana University System, but their domestic partners, Siegel and Neff, are not. Snetsinger, Siegel, Grayson, and Neff, along with PRIDE, Inc., a non-profit organization of lesbian, gay, bisexual and transgender Montanans and their supporters, filed an action in the District Court challenging the University System’s policy prohibiting same-sex domestic partners of gay[1] employees from purchasing dependent benefits.
¶5 Snetsinger and Siegel consider themselves married and hold themselves out to their families and their community as a couple in a committed, marital relationship. They have stated they would marry if legally permitted to do so. They own their home together in joint tenancy with rights of survivorship, have a joint checking account and share all living expenses. Likewise, Grayson and Neff consider themselves married and hold themselves out as such. They own their home together, share living expenses and are raising a child together. ¶6 As a benefit of employment, the University System provides a group health insurance plan for its employees and their dependents. The University System pays the premium for the employee; if the employee would like coverage for any dependents, the employee must pay an additional premium. The University System’s policy defines dependent eligibility. It states:
An eligible employee... may enroll the following dependents in the Plan.
1. Spouse-A lawful spouse as defined in Montana law. See 26-1-602, 40-1-301, and 40-1-311 MCA. A Declaration of Common-Law Spouse form may be obtained from the campus payroll/personnel office and must be used if a common-law spouse is to be enrolled in the Plan.
2. Child(ren)-An unmarried dependent child under age 19.
3. Student-An unmarried student under age 25, who is a dependent of the employee and/or spouse and dependent on the *152 employee and/or spouse for support and maintenance, and whose time is principally devoted to the attendance of a school or college. The Claims Administrator may periodically require the submission of proof that student status is maintained.
¶7 Snetsinger and Grayson are not permitted to enroll their same-sex domestic partners because they are not “dependents” as defined by the University System’s policy. They argue the policy impermissibly discriminates against them based on their sex, sexual orientation and marital status and violates their rights to equal protection and dignity provided by Article II, Section 4, the right to privacy provided by Article II, Section 10, and the rights to pursue life’s basic necessities and to seek safety, health and happiness provided by Article II, Section 3, of the Montana Constitution because the policy does not extend coverage to same-sex domestic partners.
¶8 The University System filed a Motion to Dismiss in the District Court pursuant to Rule 12(b)(6), M.R.Civ.P., on the ground the Complaint did not state a legal claim upon which relief could be granted. The District Court granted the motion. Snetsinger and the other plaintiffs appeal from the District Court’s Order.
¶9 We note that an unusual number of Amici Curiae briefs have been filed in this appeal. The following amici have submitted briefs in support of the Appellants: Northwest Women’s Law Center; Montana Human Rights Network, Outfield Alliance, Rainbow Connection, University Congregational United Church of Christ, Missoula, United Congregational United Church of Christ, Butte, and Flathead Valley United Church of Christ, Kalispell; MEA-MFT; Women’s Law Caucus. Amici who submitted briefs in support of the Respondents are: The Honorable Roy Brown, Duane Grimes, Doug Mood, Fred Thomas, and Corey Stapleton, Members of the Leadership of the 58th Montana Legislature; the Montana Catholic Conference; the National Legal Foundation; Focus On the Family and Family Research Council; United Families International.
STANDARD OF REVIEW
¶10 A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of a claim which would entitle the plaintiff to relief. Dukes v. Sirius Const., Inc., 2003 MT 152, ¶ 11, 316 Mont. 226, ¶ 11, 73 P.3d 781, ¶ 11 (citation omitted). A motion to dismiss under Rule 12(b)(6), M.R.Civ.P., has the effect of admitting all well-pleaded allegations in the complaint. Dukes, ¶ 11. In considering the motion, the complaint is construed in the light most favorable to the plaintiff and *153 all allegations of fact contained therein are taken as true. Dukes, ¶ 11 (citation omitted).
¶11 The District Court’s determination that the Appellants failed to state a claim for which relief was available is a conclusion of law. Our standard of review of a district court’s conclusion of law is whether its interpretation of the law is correct. Dukes, ¶ 11.
DISCUSSION
¶12 Whether the Montana University System’s policy prohibiting gay employees from receiving insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution.
¶13 At the outset, it is important to note what this case is not about. Lest there be any doubt, the Appellants clearly stated, both in their brief and in oral argument, that they are not challenging Montana’s marriage laws which provide marriage is available only to partners of the opposite sex. Although the constitutionality of such laws has been attacked in various states recently with much national attention, the Appellants emphasized during oral argument that this case does not present such a challenge. Therefore, we have not been asked nor will we address the question of whether Montana’s marriage statutes discriminates against same-sex couples by denying them the right to marry.
¶14 Appellants argue that the University System’s Policy violates their rights to equal protection and dignity provided by Article II, Section 4, by classifying them based on their sex, sexual orientation and marital status and depriving them, without sufficient justification, of the benefits other employees and their families receive as compensation. They also argue the policy violates their right to privacy provided by Article II, Section 10, and the rights to pursue life’s basic necessities and to seek safety, health and happiness provided by Article II, Section 3, of the Montana Constitution.
¶15 Article II, Section 4, of the Montana Constitution guarantees equal protection of the law to all persons. It provides that “[n]o person shall be denied the equal protection of the laws.” “The Fourteenth Amendment to the United States Constitution and Article II, Section 4, of the Montana Constitution embody a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner.” McDermott v. Montana Dept. of Corrections, 2001 MT 134, ¶ 30, 305 Mont. 462, ¶ 30, 29 P.3d 992, ¶ 30. Article II, Section 4, of the Montana Constitution provides even more individual protection than the Equal Protection Clause in the Fourteenth Amendment of the United States Constitution. Cottrill v. Cottrill Sodding Serv. (1987), 229 *154 Mont. 40, 42, 744 P.2d 895, 897.
¶16 When analyzing an equal protection challenge, we “must first identify the classes involved and determine whether they are similarly situated.” Henry v. State Compensation Ins. Fund, 1999 MT 126, ¶ 27, 294 Mont. 449, ¶ 27, 982 P.2d 456, ¶ 27 (citation omitted). A law or policy that contains an apparently neutral classification may violate equal protection if “in reality [it] constitutes] a device designed to impose different burdens on different classes of persons.” State v. Spina, 1999 MT 113, ¶ 85, 294 Mont. 367, ¶ 85, 982 P.2d 421, ¶ 85.
¶17 Once the relevant classifications have been identified, we next determine the appropriate level of scrutiny. Henry, ¶ 29. We apply one of three levels of scrutiny when addressing a challenge under the Montana Constitution’s Equal Protection Clause: strict scrutiny, middle-tier scrutiny, or the rational basis test. McDermott, ¶¶ 31-32. Strict scrutiny applies if a suspect class or fundamental right is affected. McDermott, ¶ 31. Under the strict scrutiny standard, the State has the burden of showing that the law, or in this case the policy, is narrowly tailored to serve a compelling government interest. McDermott, ¶ 31.
¶18 We apply middle-tier scrutiny if the law or policy affects a right conferred by the Montana Constitution, but is not found in the Constitution’s Declaration of Rights. McDermott, ¶ 32. Under middle-tier scrutiny, the State must demonstrate the law or policy in question is reasonable and the need for the resulting classification outweighs the value of the right to an individual. McDermott, ¶ 32.
¶19 The third level of scrutiny is the rational basis test. McDermott, ¶ 32. The rational basis test is appropriate when neither strict scrutiny nor middle-tier scrutiny apply. McDermott, ¶ 32. Under the rational basis test, the law or policy must be rationally related to a legitimate government interest. McDermott, ¶ 32.
¶20 The District Court began its analysis by noting the University System’s policy provides that its employees may obtain health benefits for their dependents, and dependent eligibility is limited to spouses and certain children. The court then defined the classes, for equal protection purposes, as employees who have dependents and those who do not. Thus, according to the District Court, the policy is neutral with respect to gender and sexual orientation. Inherent in this classification definition, however, is the statutory definition of spouse. The District Court reasoned the classification is based on marital status. The District Court determined the marital relationship imposes on married persons certain legal responsibilities, including the duty to support each other out of their property and labor. Section 40-2-102, MCA. The court *155 noted the Appellants are not subject to similar legal obligations and responsibilities as are imposed on married persons. This distinction apparently persuaded the District Court to conclude the University System’s policy to provide benefits only to married couples satisfied the rational basis test.
¶21 On appeal, the University System predictably echoes the District Court’s conclusion that the policy in question classifies people based on marital status. In arguing the classifications are rational, the University System relies on Montana’s statute defining marriage as a relationship between a man and a woman. Section 40-1-103, MCA. The University System also cites to § 40-1-401, MCA, which explicitly states a marriage between persons of the same sex is prohibited. It posits that because state and federal statutes are full of distinctions between married and unmarried individuals (i.e. taxes, inheritance, adoption, rights of witnesses and eligibility for government benefits), the University System’s reliance on Montana’s marriage statute for its classification is “inherently rational.” It argues the marriage distinction provides a rational and administratively simple method to determine eligibility for defining dependent status for health benefits.
¶22 In adopting such a policy, the University System rejected the concept of “domestic partners,” which would provide same-sex couples the same health benefits as opposite-sex couples. As pointed out by Amicus Northwest Women’s Law Center, this is in direct contrast to many universities, corporations and municipalities throughout the United States that do allow same-sex domestic partners to qualify for benefits. Among the list of such entities are the states of Washington, Oregon, and California as well as the United States House of Representatives. The University System’s policy at issue here permits three classes of employees to purchase health benefits for their partners: 1) those, who with their partners, are joined in “solemnized marriage” under § 40-1-301, MCA; 2) those, who with their partners, have elected to enter into marriage using a Declaration of Marriage without solemnization under § 40-1-311, MCA; and 3) those, who with their opposite-sex partners, are not married but who sign an “Affidavit of Common Law Marriage.” This third avenue is not provided by statute nor does it satisfy § 40-1-311, MCA.
¶23 Although the University System maintains its system is “inherently rational” because it is based on the Montana marriage statutes, we conclude the policy is inherently flawed. The policy allows unmarried opposite-sex couples, who may only have a fleeting relationship, to receive health insurance benefits by signing an Affidavit. The Affidavit is provided by the University System and is *156 typically used to establish benefit eligibility for a partner in a relationship that has not been solemnized or registered as a marriage under Montana law. Presumably, a couple who declines to sign a statutory written declaration of marriage without solemnization, and instead signs the Affidavit provided by the University System, may choose not to marry at all, but rather may choose to sign a document in order to receive employment benefits.
¶24 Common law marriage in Montana is an equitable doctrine used to ensure people are treated fairly once a relationship ends. Under our common law, such a marriage is established when a couple: 1) is competent to enter into a marriage, 2) mutually consents and agrees to a common law marriage, and 3) cohabits and is reputed in the community to be husband and wife. In re Ober, 2003 MT 7, ¶ 9, 314 Mont. 20, ¶ 9, 62 P.3d 1114, ¶ 9 (citing Matter of Estate of Hunsaker, 1998 MT 279, ¶ 32, 291 Mont. 412, ¶ 32, 968 P.2d 281, ¶ 32). A closer examination of common law marriage in Montana discloses that the concept is designed, in part, to prevent an unjust economic harm to couples who have held themselves out as husband and wife as our common law marriage cases typically deal with the equitable distribution of economic benefits after the death of one of the parties or separation of the relationship. We are aware of no Montana case in which a common law marriage was established prospectively. In fact, one writer has noted that no jurisdiction permits a statement of future intent to create a common law marriage. See, e.g., Hon. John B. Crawley, Is the Honeymoon over for Common-Law Marriage: A Consideration of the Continued Viability of the Common-Law Marriage Doctrine, 29 Cumb.L.Rev. 399, 403 (1998-99). We are also not aware of any Montana case in which a common law marriage was established without one of the parties involved in the relationship using extrinsic evidence to prove “that the three elements of common-law marriage all existed at one time.” Hunsaker, ¶ 43. At the very least, despite assertions by the University System, common law marriages are not automatically recognized by signing their Affidavit. The University System’s policy creates no such marriage, nor should it. A policy that allows unmarried opposite-sex couples to sign an Affidavit asserting they are common law married, when they may not be able to legally establish a common law marriage, certainly does not promote marriage, and instead, detracts from it.
¶25 In Matter of Estate of McClelland (1975), 168 Mont. 160, 541 P.2d 780, although the couple signed an affidavit asserting a common law marriage, we declined to recognize such a marriage. In McClelland, Genie Driver appealed the District Court’s determination that she was *157 not the common law wife of James McClelland. We affirmed the District Court’s decision, despite the fact that J ames and Genie signed affidavits declaring their intention to be common law married in order to receive welfare benefits from the states of Oregon and Montana. We reasoned the evidence, including the affidavit, when considered in its entirety, did not support the elements of a common law marriage.
¶26 A closer look at the University System’s policy discloses that marital status, as defined by Montana statutes and case law, plays little if any role in determining who is eligible for benefits. Under the policy, the partner of a non-gay employee would qualify for benefits by signing an Affidavit, when the partner of a gay employee would not qualify for the same benefits when signing the same Affidavit.
¶27 Thus, we conclude the District Court erred in its first step of equal protection analysis. In adopting marital status as the litmus test and then reasoning that the classes involved are employees with dependents vs. employees without dependents, the District Court misinterpreted the University System policy. As pointed out above, marital status is not the defining difference. In truth, unmarried opposite-sex couples are able to avail themselves of health benefits under the University System’s policy while unmarried same-sex couples are denied the health benefits. These two groups, although similarly situated in all respects other than sexual orientation, are not treated equally and fairly. The principal purpose of the Equal Protection Clause, Article II, Section 4, of the Montana Constitution, is to ensure citizens are not subject to arbitrary and discriminatory state action. Therefore, we conclude there is no justification for treating the two groups differently, nor is the University System’s policy rationally related to a legitimate governmental interest. Once the illusory marital status is removed from the analysis, there is no legitimate governmental interest in treating the two groups differently. As former Chief Justice Tu mage recognized in his concurrence in Gryczan v. State (1997), 283 Mont. 433, 456, 942 P.2d 112, 126, when the State criminalizes sexual acts between persons of the same-sex and decriminalizes the same sexual conduct engaged in by opposite-sex couples, it is “[c]learly ... a denial of the constitutional guarantee of equal protection of the law in violation of... Article II, Section 4 of the Montana Constitution.” Similarly, the University System’s policy of denying health benefits to unmarried same-sex couples while granting the benefits to unmarried opposite-sex couples results in a denial of equal protection.
¶28 Further, we are unconvinced that the University System’s policy is justified based on administrative efficiency. Other policies could *158 certainly be adopted without infringing on the important constitutional provisions that protect all Montanans. We are confident the University System can meet this task.
¶29 Because we hold that the University System’s policy violates equal protection of the laws under the Montana Constitution by impermissibly treating unmarried same-sex couples differently than unmarried opposite-sex couples, we need not address the Appellants’ arguments that the policy violates equal protection by classifying them based on sex or that it violates their rights under Article II, Sections 3 and 10, of the Montana Constitution.
¶30 At this point it is important to respond to several of the points urged by the dissent. The dissent contends that we have decided this case on a theory or issue that was not argued or raised by the parties. This simply is not true. The Appellants squarely argued in their brief that the University System’s policy was constitutionally infirm because of the Affidavit procedure employed by the University System. Additionally, the issue presented by Appellants in their brief clearly states: “Whether a public employer that provides an opportunity for employees to purchase insurance for spouses or for different-sex domestic partners who sign an Affidavit of Common Law Marriage but not for same-sex domestic partners violates the rights to equal protection and dignity....” Further, the Affidavit procedure was a major focus during oral argument; both sides aired their respective positions eloquently and fully on the issue as framed in this Opinion.
¶31 The dissent argues “[t]he problem is that Appellants did not raise this claim [the Affidavit procedure] in the District Court, the District Court did not consider or rule upon such claim, and therefore, Appellants are not permitted to raise a new argument on appeal.” However, nowhere in its brief does the Respondent raise the dissent’s argument that the Affidavit procedure was not raised at the District Court level and therefore we should not consider it. Respondent actually devotes approximately five pages of its brief to a common law marriage analysis that includes the Affidavit process, yet never argues the issue was not brought up at the District Court level. Additionally, the constitutionality of the University System’s policy of allowing opposite-sex couples to receive benefits while denying same-sex couples those same benefits has always been the issue, both at the District Court and in this Court.
¶32 The dissent also mistakenly contends that somehow we have rewritten the doctrine of common law marriage in Montana. Again, the dissent misinterprets our decision. In truth, it is the dissent who suggests that we deviate from our common law marriage jurisprudence. *159 The dissent apparently takes the position that because the University System’s policy is rationally related to the institution of marriage, by applying the “thousands of years of cultural experience,” “hundreds of years of legal precedent” and our statutory presumption provided in § 26-1-601(30), MCA, the policy is legitimate. By this rationale, those employees who fill in the Affidavit supplied by the University System are instantly joined or recognized to be in a common law marriage. Notwithstanding this statutory presumption which has existed for decades, our case law has required more than signing a piece of paper to establish a common law marriage. The dissent now urges that we abandon this precedent and declare that only the University System’s Affidavit is necessary because the State has an interest in promoting marriage. This rationale is just not correct.
¶33 Meanwhile, we rely on our past precedent that clearly defines what is required to create a common law marriage. We reiterate-we know of no case where a common law marriage has been recognized prospectively. Our case law consistently holds that one of the parties to the relationship must assert, through extrinsic evidence, that all of the common law marriage elements were met and occurred at the same time, sometime dining their relationship. This type of relationship-a marriage-cannot be created through an Affidavit procedure used to provide benefits for University System employees. While the Affidavit could possibly be used as one part of the extrinsic evidence used to demonstrate a common law marriage existed, it does not a marriage make. Those employees who sign an Affidavit may not be legally married under Montana law and may not have legal responsibilities to one another, like a married couple would have to each other. Those opposite-sex couples who fill out the Affidavit in order to receive benefits may be shocked to think that they have in fact entered into a marriage that requires court action to dissolve as suggested by the dissent.
¶34 Although the dissent relies on the marriage statutes to provide a rational basis for the University System’s policy, we believe the University System’s Affidavit process actually serves to dilute marriage as defined and provided for by Montana statute. In this state, there is no common law in any case where the law is declared by statute. Section 1-1-108, MCA. In Montana, common law marriages are declared valid by statute. Section 40-1-403, MCA. However, a common law procedure — a written declaration of a common law marriage such as an affidavit-cannot be followed when it is inconsistent with clear statutory law. Should opposite-sex employees wish to prospectively assure their marital status through the use of an affidavit, there is no need to resort *160 to the “common law” since Montana statutory law provides for a written declaration of marriage without solemnization and they may avail themselves of this informal statutory process as provided by the Legislature in § 40-1-311, MCA.
¶35 Our opinion today reiterates and reaffirms existing common law marriage jurisprudence. We haven’t changed anything. We do make clear, however, that any organization that adopts an administrative procedure in order to provide employment benefits to opposite-sex partners who may not be in a legal marital relationship, must do the same for same-sex couples. To not do so violates equal protection.
¶36 As one last point, the dissent worries that state, federal and private agencies that routinely recognize common law marriages by administrative declaration, and pay financial benefits based upon that administrative action could be affected by this decision. However, as the dissent points out, “those agencies defer to the law of the applicant’s domiciliary state in regard to the validity and establishment of a common law marriage.” Here, we have not changed common law marriage. These agencies may continue to operate in any fashion they desire and rely on our long history of case law in determining whether individuals are “married” by common law. However, should the agencies wish to give prospective recognition of common law marriage, they should require the parties to comply with § 40-1-311, MCA.
¶37 Reversed.
JUSTICES NELSON, COTTER and LEAPHART concur.
JUSTICE NELSON specially concurs.

I. Introduction

¶38 “We the people’-Montana’s Constitution begins with these three words. These words precede “the people[’s]” statement of shared commitment to improving their quality of life and equality of opportunity and to securing the blessings of liberty for present and future generations. In these three words, there is no mention of race, there is no mention of gender, nor is there any reference to religious affiliation, to ethnic background, to marital status or to sexual orientation. Simply and eloquently, the first words of Montana’s Constitution are words of inclusion.
¶39 Yet, for many Montanans these words carry no such promise. These Montanans live and work and raise their families knowing that, truly, they are not part of “the people.” These Montanans are gays and lesbians. And, for that-for being who they are-they are ridiculed, ostracized, despised, demonized and condemned. Their pleas for respect and for equal justice are answered by their government, by their *161 institutions-and by “We the people”-with intolerance and bigotry, albeit impeccably adorned in sanctimonious rhetoric, sterile logic and hollow assurances.
¶40 Though marginalized by their government and institutions, gay and lesbian couples live in 55 of 56 counties in Montana. More than twelve hundred Montana households identified themselves in the 2000 census as being headed by gay and lesbian couples. That is roughly 0.6% of the total coupled households in this state, married or unmarried.[2] Smith and Gates estimate that these official data represent an undercount of about 62%.[3]
¶41 I concur in our Opinion. However, Montana’s Constitution provides a stronger bulwark against the majoritarian oppression that gays and lesbians suffer daily in this State and for the claims under consideration here. It is for this reason that I write separately.
¶42 I begin with some background and then turn to my interpretation of Montana’s Constitution as regards the issue before us. Finally, I will conclude with what I believe is a proper basis for resolving this case in addition to that set out in this Court’s Opinion.

II. Background

¶43 The amicus brief filed by the Montana Human Rights Network, et al., in this case thoroughly discusses how gays and lesbians historically have been unfairly stigmatized and stereotyped. They have been wrongfully accused of having impaired judgment, stability, reliability and general social and vocational capabilities. The evidence is to the contrary. American Psychiatric Association, Fact Sheet: Gay, Lesbian and Bisexual Issues (Feb. 2000) (hereinafter APA Fací Sheet)-, American Psychological Association, Minutes of the Annual Meeting of the Council of Representatives, 30 Am. Psychologist 620,633 (1975). They have been falsely stereotyped as being pedophiles. Carole Jenny, et al., Are Children at Risk of Sexual Abuse by Homosexuals?, 94 Pediatrics 44 (1994) (finding that only 0.7% of child sex abusers are homosexual); John Boswell, Christianity, Social Tolerance and Homosexuality 16 *162 (1980) (noting that accusations of child molestation have historically been made against disfavored minorities vulnerable to such “propaganda,” be they homosexuals, Jews or others).
¶44 Children raised by gay and lesbian parents have been found to develop no differently than children raised by heterosexual parents in terms of self-esteem, psychological well-being, cognitive functioning and social adjustment, despite claims to the contrary. APA Fact Sheet (“[Njumerous studies have shown that the children of gay parents are as likely to be healthy and well adjusted as children raised in heterosexual households.”); Judith Stacey and Timothy Biblarz, (How) Does the Sexual Orientation of Parent Matter?, 66 Am. Soc. Rev. 159, 161 (2001) (surveying research); Ellen C. Perrin, M.D., and the Committee on Psychological Aspects of Child and Family Health, American Academy of Pediatrics, Policy Statement: Coparent or Second Parent Adoption by Same Sex Parents, 109 Pediatrics 339, 339 (Feb. 2002). And, there is no evidence that gays and lesbians do not function as effectively in the workplace or that they contribute any less to society than do their heterosexual counterparts.
¶45 It is overwhelmingly clear that gays and lesbians have been historically subject to unequal treatment and invidious discrimination. See, e.g., Watkins v. United States Army (9th Cir. 1989), 875 F.2d 699, 724-28 (Norris, J., concurring), cert. denied, 498 U.S. 957, 111 S.Ct. 384, 112 L.Ed.2d 395 (1990); High Tech Gays v. Defense Indus. Sec. Clearance Office (9th Cir. 1990), 895 F.2d 563, 573; Ben-Shalom v. Marsh (7th Cir. 1989), 881 F.2d 454, 465, cert denied by Ben-Shalom v. Stone, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990); Padula v. Webster (D.C. Cir. 1987), 822 F.2d 97, 104; Tanner v. Oregon Health Sciences Univ. (1998), 971 P.2d 435, 447; Laurence H. Tribe, American Constitutional Law 1616 (2d ed. 1988).
¶46 Gays and lesbians have been stereotyped as Communists and security risks. Patricia A. Cain, Litigating for Lesbian and Gay Rights: A Legal History, 79 Va. L. Rev. 1551, 1565 (Oct. 1993) (hereinafter Cain). In 1953, President Eisenhower issued Executive Order 10,450 which required the dismissal of all homosexual government employees. Cain, at 1566. Until 1965, homosexual aliens could not be admitted to the United States because they were classified as sexual deviants under 8 U.S.C. § 1182(a)(4). Tracey Rich, Sexual Orientation Discrimination in the Wake of Bowers v. Hardwick, 22 Ga. L. Rev. 773, 773 n.4. (Spring 1988); Boutilier v. INS (1967), 387 U.S. 118, 124, 87 S.Ct. 1563, 1567, 18 L.Ed.2d 661 (upholding deportation because “Congress commanded that homosexuals not be allowed to enter.”)
*163 ¶47 Similarly, in the workplace, gays and lesbians historically have been the focus of discriminatory treatment. See, e.g., Weaver v. Nebo School Dist. (D. Utah 1998), 29 F.Supp.2d 1279 (lesbian high school coach in Utah fired because of sexual orientation); Miguel v. Guess (Wash.App.Div.3 2002), 51 P.3d 89 (lesbian x-ray technician in hospital fired because of sexual orientation); De Santis v. Pacific Tel. & Tel. Co. (9th Cir. 1979), 608 F.2d 327 (California telephone company discriminated against gay and lesbian operators); Quinn v. Nassau County Police Dept. (E.D.N.Y. 1999), 53 F.Supp.2d 347 (gay New York police officer sexually harassed because of his sexual orientation).
¶48 And, gays and lesbians are frequently the victims of violence and hate crimes. Federal Bureau of Investigation, Hate Crime Statistics 2000 (November 19, 2001), and 2001 (November 25, 2002).[4] Indeed, grim testament to this sort of violence and hate occurred in our sister state of Wyoming in October 1998, when Matthew Shephard, a gay college student, was savagely beaten, tied to a fence and left to die. ¶49 Gay and lesbian parents are frequently denied custody of their children or are subjected to burdensome restrictions because of their sexual orientation and irrespective of their parenting ability. See, e.g., Ex parte H.H. (Ala. 2002), 830 So.2d 21, 26 (Moore, C.J., concurring in denial of custody to lesbian mother on ground that “[h]omosexual conduct is ... abhorrent, immoral, detestable, a crime against nature, and a violation of the laws of nature and of nature’s God [and] an inherent evil against which children must be protected.”); Weigand v. Houghton (Miss. 1999), 730 So.2d 581, 586-87; Bottoms v. Bottoms (Va. 1995), 457 S.E.2d 102, 107-08.
¶50 The American Psychiatric Association points out that
when compared to other social groups, homosexuals are still among the most stigmatized groups in the nation. Hate crimes are prevalent. Gay men and lesbians are still banned from serving openly in the US military service. Child custody decisions still frequently view gay and lesbian people as unfit parents. Gay and lesbian adolescents are often taunted and humiliated in their school settings. Many professional persons and employees in all occupations are still fearful of identifying as gay or lesbians in their work settings. Gay relationships are not recognized in any legal way.
*164 APA Fact Sheet. In fact, gays and lesbians share a history of persecution comparable to that of blacks and women. People v. Garcia (Cal.App.4th Dist. 2000), 77 Cal.App.4th 1269, 1276, 92 Cal.Rptr.2d 339.
¶51 Similarly, majoritarian politics relegates gays and lesbians to a position of political powerlessness. As Justices Brennan and Marshall observed, “[bjecause of the immediate and severe opprobrium often manifested against homosexuals once so identified publicly, members of this group are particularly powerless to pursue their rights openly in the political arena.” Rowland v. Mad River Local School Dist. (1985), 470 U.S. 1009, 1014, 105 S.Ct. 1373, 1377, 84 L.Ed.2d 392 (Brennan, J., dissenting from denial of certiorari', joined by Marshall, J.).
¶52 Montana reflects this discriminatory animus. Despite the judicial de-criminalization of same-sex relationships in Gryczan v. State (1997), 283 Mont. 433, 942 P.2d 112, and despite pleas every session by the gay community, the Legislature has refused to amend §§ 45-2-101(20) and 45-5-505, MCA, to except out of the deviate sexual conduct statutes noncommercial, same-sex conduct between consenting adults. The 1997 Legislature amended § 40-1-401, MCA, to specifically prohibit same sex marriages and contractual civil relationships. In 2001, a bill seeking to add sexual orientation to Montana’s hate crime statute (HB 233) never made it out of the House Judiciary Committee. Constitutional Initiative 96, amending the Montana Constitution to prohibit same sex marriages, passed overwhelmingly at the November 2004 general election. Sadly, many politicians and “We the people” rarely pass up an opportunity to bash and condemn gays and lesbians despite the fact that these citizens are our neighbors and that they work, pay taxes, vote, hold public office, own businesses, provide professional services, worship, raise their families and serve their communities in the same manner as heterosexuals.
¶53 In terms of the workplace, there is no evidence either in the record here or anecdotally that gays and lesbians are any less qualified, reliable or productive employees than are heterosexuals. Indeed, as amicus MEA-MFT points out, because equal work merits equal pay and benefits, nearly 200 educational institutions in at least 35 states and thousands of companies, including 40% of Fortune 500 companies, include domestic partners in their benefits policies.[5] Likewise, there is *165 no evidence either in the record here or anecdotally that extending health and medical insurance benefits to gay and lesbian domestic partners increases the benefit or administrative costs of insurance plans. Indeed, the evidence is to the contrary.[6]

III. Montana’s Constitution

¶54 When the Declaration of Rights of Montana’s Constitution was drafted, the Bill of Rights Committee (the Committee) clearly intended that the rights set out in Article II stand on their own footing and provide individuals with fundamental rights and protections far broader than those available through the federal system. The Committee’s February 22,1972 transmittal letter to the Convention delegates states that “new safeguards” had been added to the Declaration [Bill] of Rights “to meet the changing circumstances of contemporary fife” and:
In presenting this proposed Declaration of Rights, the committee notes that the guidelines and protections for the exercise of liberty in a free society come not from government but from the people who create that government.
It is that spirit which has motivated this committee to insure for Montana’s future, through this bill of rights, a more responsible government that is Constitutionally commanded never to forget that government is created solely for the welfare of the people so that the people can more fully enjoy the heritage of American liberty within the structure of that government.
Montana Constitutional Convention, Bill of Rights Committee Proposal, February 22, 1972, p. 619 (hereinafter Proposal).
¶55 Taking these admonitions to heart, this Court has, for example, applied the broader protections of Montana’s Constitution in a number of contexts involving individual privacy (Gryczan v. State (1997), 283 Mont. 433, 942 P.2d 112); personal autonomy (Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364); search and seizure (State v. Bullock (1995), 272 Mont. 361, 901 P.2d 61; State v. Siegal (1997), 281 Mont. 250, 934 P.2d 176, overruled in part by State v. Kuneff, 1998 MT 287, 291 Mont. 474, 970 P.2d 556; State v. Elison, 2000 MT 288, 302 Mont. 228, 14 P.3d 456); the right to counsel (State v. Johnson (1986), *166 221 Mont. 503, 719 P.2d 1248); the environment (MEIC v. Dept. of Environmental Quality, 1999 MT 248, 296 Mont. 207, 988 P.2d 1236); and the right of participation and the right to know (Common Cause v. Statutory Committee (1994), 263 Mont. 324, 868 P.2d 604; Great Falls Tribune v. Public Schools (1992), 255 Mont. 125, 841 P.2d 502; Associated Press v. Bd. of Public Educ. (1991), 246 Mont. 386, 804 P.2d 376; Jarussi v. Board of Trustees (1983), 204 Mont. 131, 664 P.2d 316). ¶56 Furthermore, and acknowledging the Committee’s statement that no part of the Constitution is more important, Proposal, p. 619, we have repeatedly recognized the rights found in Montana’s Declaration of Rights as being “fundamental,” meaning that these rights are significant components of liberty, any infringement of which will trigger the highest level of scrutiny, and thus, the highest level of protection by the courts. Walker v. State, 2003 MT 134, ¶ 74, 316 Mont. 103, ¶ 74, 68 P.3d 872, ¶ 74 (citing Dorwart v. Caraway, 2002 MT 240, ¶ 96, 312 Mont. 1, ¶ 96, 58 P.3d 128, ¶ 96 (Nelson, J., concurring); Butte Community Union v. Lewis (1986), 219 Mont. 426, 430, 712 P.2d 1309, 1311; Kloss v. Edward D. Jones & Co., 2002 MT 129, ¶ 52, 310 Mont. 123, ¶ 52, 54 P.3d 1, ¶ 52 (Nelson, J., concurring), cert. denied, 538 U.S. 956, 123 S.Ct. 1633, 155 L.Ed.2d 506 (2003)).
¶57 It follows, therefore, that Montana’s Constitution should, likewise, provide more protection against discrimination based on sexual orientation than the Court’s Opinion in this case reflects.
¶58 The case at bar is one involving the fundamental guarantee of individual dignity and equal protection protected under Article II, Section 4 of the Montana Constitution. For more than a decade and a half we have recognized that Montana’s equal protection clause “provides for even more individual protection” than does the federal equal protection clause in section one of the Fourteenth Amendment. Cottrill v. Cottrill Sodding Service (1987), 229 Mont 40, 42, 744 P.2d 895, 897.
¶59 Montana’s equal protection clause, Article II, Section 4, provides:
Individual dignity. The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.
As Professors Larry Elison and Fritz Snyder observe:
As a practical matter, the vagaries of life coupled with the allure of power and privilege deny equality among persons, and make difficult the application and enforcement of equal protection before *167 the law. Perhaps that is why “in recent years the equal protection guarantee has become the single most important concept in the Constitution for the protection of individual rights.”
Larry M. Elison and Fritz Snyder, The Montana Constitution: A Reference Guide 34 (2001) (hereinafter Elison) (quoting John E. Nowwak & Ronald D. Rotunda, Constitutional Law 595 (5th ed. 1995)). ¶60 Historically, the mantle of equal protection law has expanded steadily to protect different groups of persons who were prosecuted and abused for simply being who they were born to be-racial and religious minorities and women, are examples.
Prior to passage of the Fourteenth Amendment to the U.S. Constitution (and perhaps the French Revolution), the idea of equality was limited to persons of power, usually free, white male property owners.... Over time, the notion of equality under law has expanded [to include Blacks and women], and theoretically most persons are now included. The 1972 Montana Constitution provides the most inclusive scheme of “equal rights” of any known constitution.
Elison, at 35. And, “[a]t the heart of the Constitution’s guarantee of equal protection lies the simple command that the Government must treat citizens as individuals, not as simply components of a racial [or] sexual ... class.” J.E.B. v. Alabama ex rel. T.B. (1994), 511 U.S. 127, 152-53, 114 S.Ct. 1419, 1434, 128 L.Ed.2d. 89.
¶61 However much equal protection jurisprudence has enlarged the scope of persons guaranteed this right, unfortunately gays and lesbians have been left behind. Sexual and gender orientation is not considered a “suspect class” and discrimination so based does not merit strict scrutiny/compelling interest analysis under federal law. See Lofton v. Kearney (S.D. Fla. 2001), 157 F.Supp.2d 1372, 1382 (collecting cases at n.14), affirmed by Lofton v. Sec’y of the Dep’t of Children and Family Services (11th Cir. 2004), 358 F.3d 804; Baker v. State (Vt. 1999), 744 A.2d 864, 878 n. 10; Lawrence v. Texas (2003), 539 U.S. 558, 579-88, 123 S.Ct. 2472, 2484-85, 156 L.Ed.2d 508 (O’Connor, J., concurring). In fact, as this separate Opinion earlier points out, gays and lesbians continue to suffer the effects of unequal treatment, often with the blessing, express or implied, of the government, its institutions, and its elected officials. Indeed, as already noted, laws and policies have been adopted which specifically target gays and lesbians for unequal treatment.
¶62 As with federal case law, this Court’s jurisprudence has never acknowledged gender orientation as a suspect class. Although we have stated that Article II, Section 4 provides more individual protection than does its federal counterpart, Cottrill, 299 Mont, at 42, 744 P.2d at *168 897, in practice, Montana’s equal protection jurisprudence-as the Court’s Opinion demonstrates-largely follows federal law. See Vicki C. Jackson, Constitutional Dialogue and Human Dignity: States and Transnational Constitutional Discourse, 65 Mont. L. Rev. 15, 28-29 n.45 (Winter 2004) (hereinafter Jackson)-, Elison, at 36-38[7].
¶63 This approach, however, is antithetical to the plain language of Montana’s equal protection clause and, in particular, to one of its components-the guarantee of inviolable human dignity-a textual protection unique among the fifty states. Jackson, at 21.
¶64 Montana’s human dignity clause was drawn from the Puerto Rican Constitution, Article II, Section 1. Jackson, at 22. This clause follows a history of international and foreign constitution-making and human rights declarations at the end of World War II and reflects the international community’s focus on human dignity as a fundamental value. Jackson, at 26. Puerto Rican courts and constitutional scholars have characterized the concept of the dignity of the human being as
“the moral basis for democratic government,” and implies the “essential equality” of all people before the law. In other words, the inviolable dignity of human beings must be reflected in both the governance structures of a democracy and the way in which individual members are treated.
Jackson, at 23 (quoting Juan M. Garcia-Passalacqua, Puerto Rican Constitutional Law 41 (1974)).
¶65 Notwithstanding these venerable roots, however, this Court’s jurisprudence has, for the most part, treated the human dignity clause, not as a fundamental value to be recognized in its own right,[8] but rather, as reinforcing other values such as the protection against unlawful searches and seizures, government discrimination, and privacy. Jackson, at 27-32.
¶66 The dimensions of the individual dignity clause included within Article II, Section 4, have not been well developed by this Court. See Elison, at 34, 36; Matthew O. Clifford and Thomas P. Huff, Some Thoughts on the Meaning and Scope of the Montana Constitution’s “Dignity” Clause With Possible Applications, 61 Mont. L. Rev. 301 (hereinafter Clifford). Nor have we discussed the various clauses within *169 Article II, Section 4 in relation to each other and with a view to interpreting this section as a coherent whole.
¶67 For example, in Walker, we held that, read together with Article II, Section 22, the individual dignity clause provides Montanans with greater protections from cruel and unusual punishments than does the federal constitution. We also noted that the federal constitution does not expressly provide for the right to human dignity. Walker, ¶ 73. And, in In re Mental Health of KG.F., 2001 MT 140, ¶¶ 45-60, 306 Mont. 1, ¶¶ 45-60, 29 P.3d 485, ¶¶ 45-60, we stated that the dignity of those persons subject to involuntary mental health commitments required effective assistance of counsel and appropriate due process and that groups of people should not be singled out and “devalued as members of society” or treated as “an inferior second-class of citizens.” We have also invoked the dignity clause in other contexts: Armstrong, ¶¶ 71-73 (bodily integrity); Obergv. Billings (1983), 207 Mont. 277, 280, 674 P.2d 494, 495 (right not to be subjected to a polygraph exam as a condition of employment); Girard v. Williams, 1998 MT 231, ¶¶ 77-80, 291 Mont. 49, ¶¶ 77-80, 966 P.2d 1155, ¶¶ 77-80 (Nelson, J., concurring) (child custody); and In re C.R.O., 2002 MT 50, ¶¶ 45-54, 309 Mont. 48, ¶¶ 45-54, 43 P.3d 913, ¶¶ 45-54 (Nelson, J., Cotter, J., Leaphart, J., dissenting) (termination of parental rights).
¶68 Our approach, however, has failed to give full effect to the language and unique constituent parts of Montana’s equal protection clause and to the textual protection of inviolable human dignity in cases involving fundamental human rights.
Article II, section 4 reaches beyond the boundaries of traditional equal protection. The language is unique to the extent it recognizes human dignity as a dimension of, or corollary to, the concept of equal protection of the law. The language also portends to create a right to equality within the realm of private activity, eliminating the “state action” requirement attached to the comparable provision of the U.S. Constitution.
Elison, at 35.
¶69 In my view, this Corut’s equal protection jurisprudence has been too long bounded by federal equal protection case law where fundamental human rights are at issue. There is no good reason why we should not begin to afford all Montanans the full protections intended by the framers when they adopted Article II, Section 4. As one commentator has suggested, “Montana lawyers should jettison federal discrimination analysis in favor of a Montana analysis free of gender-based standards.” Elison, at 36 (quoting Wendy A. Fitzgerald, Toward Dignity in the Workplace: Miller-Wohl and Beyond, 49 Mont. L. Rev. 147 *170 (1988)).
¶70 I agree and I believe that this is the appropriate case in which we should begin to develop the law of equal protection based on Montana’s unique Constitutional guarantee of the inviolability of human dignity coupled with the right to equal protection of the law and the prohibition against private and State discrimination. It is to that approach that I now turn.

IV. The Analytical Model

¶71 Again, Article II, Section 4 provides:
Individual dignity. The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.
Clifford and Huff point out that this provision of the Constitution is composed of three clauses: the individual dignity clause (after which the entire section is named); the equal protection clause; and the anti-discrimination clause. Clifford, at 304.
¶72 However, our canons of constitutional construction require that we treat each separate clause as both substantively meaningful and not redundant. “In construing a constitutional provision it is our duty to give meaning to every word, phrase, clause, and sentence therein, if it is possible so to do.” State ex rel. Diederichs v. State Highway Comm’n (1931), 89 Mont. 205, 211, 296 P. 1033, 1035. Clifford and Huff suggest that the plain language of Article II, Section 4 be interpreted as a cohesive whole so as to fulfill this canon of construction:
[T]he language of the dignity provision moves in a logical progression from the general to the specific. The title of the provision itself is “Individual Dignity;” thus, we must presume that all the language in the provision treats this topic in some respect. The first sentence, the dignity clause, obviously addresses dignity by declaring that human dignity is inviolable. The second sentence, we believe, goes on to declare one way in which human dignity can be violated-by denying someone the equal protection of the law based on some sort of arbitrary classification....
The third sentence of Article 4 [sic], the anti-discrimination clause, we believe, fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the authors of the dignity provision believed to be arbitrary....
Clifford, at 305-06.
*171 ¶73 Using this analytical model, I address the issue before us: Whether the Montana University System’s policy prohibiting homosexual employees from receiving insurance coverage for their same-sex domestic partners violates their rights under the Montana Constitution.
A
¶74 Article II, Section 4 is entitled “Individual dignity.” The first clause of Article II, Section 4, the “individual dignity clause,” provides: “The dignity of the human being is inviolable.” As to this clause, Clifford and Huff state:
The title of the provision itself is “Individual Dignity;” thus, we must presume that all the language in the provision treats this topic in some respect. The first sentence, the dignity clause, obviously addresses dignity by declaring that human dignity is inviolable.
Clifford, at 305.
¶75 Under this part of the model, we must necessarily start by acknowledging the obvious: pursuant to Article II, Section 4, the right of human dignity is “inviolable.” That means that this right is “incapable of being violated.” Black’s Law Dictionary 832 (7th ed. 1999). As Clifford and Huff observe: “To say, as the Montana Constitution does, that ‘[t]he dignity of the human being is inviolable’ is thus to assert that the intrinsic worth, the basic humanity, of persons may not be violated.” Clifford, at 303.
¶76 This statement strikes at the heart of the issue before us. The intrinsic worth and the basic humanity of gays and lesbians-i.e., their human dignity-has not been recognized to date.[9] Indeed, as already demonstrated, this fundamental, core value is, in many instances, denied gays and lesbians through laws and policies enacted by the government, as here.
¶77 That human dignity is described as being “inviolable” is significant, as this right is the only Article II guarantee that carries this absolute prohibition: Human dignity may not be violated-no exceptions. ¶78 Article II, Section 4 is consistent with this Country’s historical treatment of human dignity as a central, foundational ideal at the root of our concept and system of ordered liberty and of our ethical tradition. See Clifford, at 308-14. There is nothing in the record or debates of Montana’s Constitutional Convention which would demonstrate that *172 the delegates had any other view of the scope of human dignity. Indeed, Delegate Wade Dahood, chair of the Committee, stated: “[t]he intent of Section 4 is simply to provide that every individual in the State of Montana, as a citizen of this state, may pursue his inalienable rights without having any shadows cast upon his dignity through unwarranted discrimination.” Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, p. 1643.
¶79 Laws and policies which single out, degrade and demonize persons based on their gender or sexual orientation-i.e., for simply being who they are-casts a shadow on the individual dignity of such persons and devalues those persons basic humanity and the intrinsic worth that all people possess. See Walker, ¶¶ 81-82. Such treatment repudiates the “essential equality” of all people before the law and the “moral basis for democratic government.” Jackson, at 23. Gays and lesbians have the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives, to answer to their own consciences and convictions, see Armstrong, ¶ 72, and, as autonomous human beings, the inherent right to form relationships with whomever they choose. These rights are no more nor less than heterosexuals enjoy. Indeed, they are precisely the same rights that those representing and supporting the Respondents rightly enjoy and demand. Unequal treatment based on sexual orientation is an affront to the inviolable right of human dignity. Government policies that allow or require such treatment are, in my view, per se unlawful under the dignity clause of Article II, Section 4. Such is the University’s policy at issue here-it treats gay and lesbian couples unequally in terms of employment; equal work does not merit equal benefits based on nothing else than gender and sexual orientation.

B.

¶80 The second clause of Article II, Section 4, the “equal protection clause,” provides: “No person shall be denied the equal protection of the laws.” As to that clause, Clifford’s and Huffs model provides:
The second sentence, we believe, goes on to declare one way in which human dignity can be violated-by denying someone the equal protection of the law based on some sort of arbitrary classification.
Clifford, at 305-06.
¶81 Again it must be noted at the outset, that the equal protection clause states that “No person” shall be denied the equal protection of the laws. The language is clear and unambiguous. “No person” means simply that-there is no language in this clause excepting out of this guarantee gays and lesbians. At least our society has not come to the *173 position that homosexuals are not even to be considered as persons.
¶82 As has already been pointed out, neither federal jurisprudence nor this Court’s case law recognizes gender or sexual orientation as an arbitrary classification or “suspect class” for equal protection purposes. This view, however popular, is inherently illogical when one acknowledges that the entire focus of laws directed at gays and lesbians is sex. Majoritarian morality and prevailing political ideology are offended by the fact that people of the same sex have sexual relations with each other. This offense translates into laws and policies that explicitly or implicitly demonize homosexuals and make them a disfavored class. Heterosexuals, on the other hand, are a favored class because their sexual relations are with persons of the opposite sex. Homosexuals are a disfavored class because their sexual relations are with persons of the same sex. Regardless, however, the defining criteria of either class is plainly and simply sex-or, to be more specific, with which sex one is having sex. To paraphrase an old adage, “When they say it isn’t about sex, it’s about sex.”
¶83 Laws based on gender orientation are palpably sex-based and are, therefore, suspect classifications under conventional equal protection analysis.
¶84 Andrew Koppelman, an associate professor of law and political science at Northwestern University, makes this point in two starkly simple syllogisms:

First syllogism:

(1) Laws that make people’s legal rights depend on their sex are sex-based classifications.
(2) Laws that discriminate against gay people are laws that make people’s legal rights depend on their sex....
Therefore,
(3) Laws that discriminate against gay people are sex-based classifications.

Second syllogism:

(1) Sex-based classifications are subject to heightened scrutiny.
(2) (from the first syllogism) Laws that discriminate against gay people are sex-based classifications.
Therefore,
(3) Laws that discriminate against gay people are subject to heightened scrutiny.
Andrew Koppelman, The Gay Rights Question in Contemporary American Law 53-54 (2002)
(hereinafter Koppelman).
¶85 Moreover, it has been the law in Montana for two decades that
*174 [a] suspect class is one “saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process.”
In re C.H. (1984), 210 Mont. 184, 198, 683 P.2d 931, 938 (quoting San Antonio School District v. Rodriguez (1973), 411 U.S. 1, 28, 93 S.Ct. 1278, 1294, 36 L.Ed.2d 16). Given the discussion with which I began this separate Opinion, it cannot reasonably be argued that gays and lesbians do not fit within this definition of suspect class.
¶86 Therefore, I conclude that gays and lesbians constitute a suspect class under conventional equal protection analysis. Unequal treatment based on sexual orientation denies the person equal treatment, equal justice, and equal protection under the law.
¶87 In the case at bar, heterosexual couples are entitled to more and better employment benefits than are homosexual couples. This unequal treatment is based on gender and sexual orientation and is, therefore, sex-based-it is a classification which is inherently arbitrary and suspect, because it violates the inviolable human dignity of the persons so classified and those persons’ fundamental right to equal protection of the laws.
C.
¶88 The third clause of Article II, Section 4, the “anti-discrimination clause,” provides: “Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.” The final part of Clifford’s and Huffs model states:
The third sentence of Article 4 [sic], the anti-discrimination clause, we believe, fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the authors of the dignity provision believed to be arbitrary....
Clifford, at 306.
¶89 The arbitrary classifications enumerated in the discrimination clause of Section 4 are race, color, sex, culture, social origin or condition, and political or religious ideas. But, as Clifford and Huff point out, this list is not exhaustive of arbitrary classifications, because if that were the case, then the second clause, the equal protection clause, would be surplusage. Presumably the framers of the Constitution included the more general equal protection clause so as to leave open the possibility of other prohibited classifications beyond those recognized at that time. Moreover, the inclusion of the more general provision protecting the right of human dignity must presume that dignity can be violated in *175 ways that do not involve arbitrary classifications. Clifford, at 306. Were that not the case, then the individual dignity clause would be surplusage as well; it would have no independent significance in the scheme of Article II, Section 4.
¶90 Notwithstanding my conclusion that discrimination based on sexual orientation is sex-based under conventional equal protection analysis, infra, I agree with Clifford and Huff that the fist of arbitrary classifications in the third clause of Article II, Section 4 is not-and, indeed, should not-be exhaustive. I would hold that homosexuals comprise a suspect class in their own right. I reach that conclusion by reference to another important, but virtually ignored, section in the Declaration of Rights.
¶91 The Delegates’ intention that our Constitution’s Declaration of Rights not be interpreted as limiting civil rights, but, rather, as the enumeration of basic guarantees that a free and sovereign society — “We the people’-should enjoy is best exemplified in the Committee’s proposal of Article II, Section 34 to the Convention delegates and in the subsequent adoption of this provision. Article II, Section 34 states:
Unenumerated rights. The enumeration in this constitution of certain rights shall not be construed to deny, impair, or disparage others retained by the people.
¶92 In proposing the adoption of this section, the Committee did two things. First, it recognized that the rights enumerated in Montana’s Constitution were not exclusive-i.e., that there are unenumerated rights or “rights beyond those specifically listed” which are retained by the people. Proposal, p. 645. Second, and important to my discussion here, the Committee considered this section to be “a crucial part of any effort to revitalize the state government’s approach to civil liberties questions. [And that this section] may be the source of innovative judicial activity in the civil liberties field.” Proposal, p. 645.
¶93 The proceedings of the Constitutional Convention reveal no debate on Article II, Section 34. Rather, it was adopted unanimously on the straightforward, yet eloquent recommendation of Delegate Dorothy Eck, who stated: “I think that [this section] is completely self-explanatory. There are rights which are not enumerated which the people of Montana should not be denied.” Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1832.
¶94 Elison and Snyder observe that the Committee’s belief that Article II, Section 34 could be the source of “innovative judicial activity” in the area of civil liberties has not been realized; that there are no cases referencing or interpreting this section. Elison, at 86. While technically inaccurate that no cases have referenced this section, see Dorwart, n.3 *176 (Nelson, J., concurring), it is true that this Court has not applied Article II, Section 34 in any substantive context.
¶95 Elison and Snyder suggest:
The section could be used as the basis for the introduction of a theory of natural law or an expansion of the use of substantive due process or judicial finding of unstated individual rights hidden in the self-reliant, free-thinking, idiosyncratic Montanan mythology. Presumptively, this could limit state police power and enlarge existing rights or create new rights.... While plenary state legislative power and unenumerated rights might appear to be in conflict or contradictory, they are not. In a state constitution a provision on unenumerated rights as a balance against state police power is a potentially useful idea, but something of an anomaly. Historically, within the context of state governments in a federal system, the limitations on plenary legislative power are the specific prohibitions and restrictions found in a constitutional declaration of rights. Adding unenumerated rights to specific prohibitions and restrictions could transfer to the people indirectly, and to the courts directly, additional means of checking plenary legislative power.
Elison, at 87.
¶96 Given that Article II, Section 34 was specifically adopted as a Constitutional source by which “to revitalize the state government’s approach to civil liberties questions,” Proposal, at 645, it is entirely appropriate that the enumerated protections afforded by Article II, Section 4 be interpreted in that broader context in the case at bar. In point of fact, it is entirely appropriate that we hold, under Article II, Section 34, that one of the unenumerated prohibited classifications beyond those recognized at the time the Constitution was adopted is the classification of individuals based on gender or sexual orientation.
¶97 In summary, applying the Clifford and Huff model, I would hold that: (a) laws and policies that make people’s rights dependent on gender or sexual orientation violate the inviolable human dignity clause of Article II, Section 4; (b) classifications of persons on the basis of gender or sexual orientation are sex-based and are therefore arbitrary and suspect under conventional equal protection analysis; and, in what I believe to be a better approach, (c) reading Article II, Sections 4 and 34 together, it is appropriate to establish, as a matter of Montana constitutional law, that classifications based on gender or sexual orientation are suspect classifications in their own right and are in addition to those enumerated in the third clause of this State’s equal protection provision.
*177 ¶98 Pursuant to this analysis, I would hold that applying strict scrutiny, the Respondents have failed to demonstrate a compelling state interest for treating heterosexual and homosexual couples differently in terms of the benefits relating to employment. See Gryczan, 283 Mont. at 449, 942 P.2d at 122. I reach this conclusion for the following reasons.
¶99 The Respondents’ arguments are framed in terms of who can be married and who cannot-heterosexuals can and homosexuals cannot. Amici supporting the Respondents focus their arguments on family values, majoritarian concepts of morality, religious doctrine and preserving the sanctity of marriage both as a civil and as a sectarian institution. These arguments are red herrings. They miss the mark and ignore the core issue here-whether gays and lesbians have the right to individual human dignity, equal protection of the laws and freedom from discrimination under Article II, Section 4 of the Montana Constitution with respect to obtaining the same economic benefits of employment that heterosexuals receive for the same work.
¶ 100 Certainly, secular organizations and religions have the right to define for their own members their beliefs, doctrines, moral tenets, rules and rituals. Individuals have the right to hold whatever personal opinions they choose. That is not to say, however, that these institutions, groups and persons may impose their philosophies and values on minorities and on others who ascribe to a different view and whose conduct and fife styles cause no harm. We stated in Gryczan:
James Madison decried the potential for a tyranny of the majority, pointing out that it was as important in our system of government to guard the minority in our society against injustice by the majority, as it was to guard society from the oppression of its rulers. The Federalist, No. 51, at 351 (James Madison) (Jacob E. Cooke ed., 1961)....
... [Despite governmental laws and policies and perceived societal notions of what is acceptable in a moral sense] there are certain rights so fundamental that they will not be denied to a minority no matter how despised by society.
Gryczan, 283 Mont. at 455, 942 P.2d at 125-26. As individual privacy was such a right in Gryczan, the fundamental rights to human dignity, to equal protection of the laws and to freedom from invidious discrimination, are in the case at bar.
¶101 The University in particular and employers in general are perfectly capable of providing gays and lesbians and gay and lesbian couples with the same economic benefits of employment that heterosexuals enjoy. And that is all this case is about-providing *178 similarly situated employees the same economic benefits from employment. This case is not about gay marriage or gay unions, as the Court’s Opinion clearly acknowledges.
¶102 As already noted, because providing gay and lesbian couples with the same employment benefits that heterosexual couples receive can be accomplished without additional cost or administrative burden to the employer, there is no legitimate economic rationale for the Respondents’ position, much less that of Amici. As this case shows, employers are able to determine partner benefits on criteria generally applicable to all people.
¶103 Here, the criteria arbitrarily chosen is marriage. But, as the Court’s Opinion demonstrates, marriage can be proven by the simple expedient of two people signing an affidavit. However, if the underlying rationale of providing partner benefits is to insure that the partners are residing together and have accepted mutual commitments of financial support, that can be satisfied by affidavit, declaration, contract or some other writing in addition to proof of marriage. Even assuming one can create a common law marriage by signing an affidavit (which as our Opinion shows is a false premise, see In re Estate of McClelland (1975), 168 Mont. 160, 164-65, 541 P.2d 780, 783), the employer has no real basis for insuring that such persons are, in fact, married, or that their arrangement is simply not one of convenience to acquire important health insurance benefits. Indeed, there is nothing stopping such persons from simply walking away from the whole arrangement when it suits their circumstances to do so.
¶ 104 Furthermore, the only basis for the argument that granting gay and lesbian couples equal employment benefits will destroy the institution of marriage is that the employer has made an arbitrary decision to use marriage as the defining criteria for granting these benefits. Were the defining criteria different-as it could easily be-the whole issue of marriage, religion and morality would cease to exist. Paying homosexual workers the same as their heterosexual counterparts has not destroyed any important institutions in or the moral fabric of our society, and there is no evidentiary basis for concluding that extending health insurance benefits to gay and lesbian couples will have that effect either. Indeed, that has not occurred in those states and with those many employers and institutions that have extended such benefits already.
¶105 Additionally, there are three reasons why the preserving-the-institution-of-marriage argument fails. First, this is not a gay marriage case. This case is about providing equal financial benefits to similarly situated employees of the same employer.
*179 ¶106 Second, the premise that extending economic employment benefits to gay and lesbian couples will somehow harm marriage is itself without merit. There is no actual evidence in the record here to support that conclusion. Indeed, arguably, heterosexuals have done more to denigrate the institution of marriage than gay and lesbian couples ever have or likely ever will. In the years since 1998, the divorce rate in Montana has averaged nearly 40%.[10] Moreover, this rate does not take into account any number of heterosexuals “living in sin,” without the benefit of any marriage, nor does it take into account married heterosexuals who are engaged in extra-marital affairs. Our society lionizes professional athletes, entertainers, and high-profile politicians despite (although one would sometimes think, because of) marital infidelity and divorces. One need simply turn on the television to understand that the “Ozzie and Harriet” and “Leave it to Beaver” genre of television shows are historical artifacts which have no popularity with the American viewing public. I submit that those championing the preservation-of-marriage argument accord a good deal more to the sanctity of the institution than do a substantial percentage of Montanans and other Americans as evidenced by their actual conduct.
¶107 Third, and importantly for our discussion here, the preservation-of-marriage argument is, transparently, little more than a convenient vehicle through which to condemn and to discriminate against gays and lesbians because of their lifestyles and gender orientations. See Clifford, at 334-35. To be sure, homosexuality offends many people’s sense of morality and the teachings of many religions. However, we live in a pluralistic society, and, as we said in Gryczan:
With respect to regulation of morals, the police power should properly be exercised to protect each individual’s right to be free from interference in defining and pursuing his own morality but not to enforce a majority morality on persons whose conduct does not harm others.... Indeed, what is considered to be “moral” changes with the times and is dependent upon societal background. Spiritual leadership, not the government, has the responsibility for striving to improve the morality of individuals. Campbell [v. Sundquist (Tenn.Ct.App. 1996)], 926 S.W.2d [250,] 265-66 (quoting Commonwealth v. Bonadio (1980), 490 Pa. 91, 415
*180 A.2d 47, 50).
... Our Constitution does not protect morality; it does, however, guarantee to all persons, whether in the majority or in a minority, those certain basic freedoms and rights which are set forth in the Declaration of Rights....
Gryczan, 283 Mont. at 454, 942 P.2d at 125. Again, as the right of individual privacy was one of those basic freedoms and rights in Gryczan, the right of human dignity, equal protection of the laws and freedom from discrimination are, likewise, basic freedoms and rights which must be protected in the case at bar. A policy of classifying persons for its own sake cannot be justified. Romer v. Evans (1996), 517 U.S. 620, 635, 116 S.Ct. 1620, 1629, 134 L.Ed.2d 855. There is no compelling state interest for the Respondent’s policy at issue here.

Conclusion

¶108 While I concur in the Court’s Opinion, I also believe that this case calls for a new approach to analyzing cases arising under Article II, Section 4 of the Montana Constitution. I submit that the approach discussed above honors the plain language, the framers’ intent and the historical underpinnings of Montana’s unique provisions protecting the rights of individual human dignity and of equal protection of the laws and prohibiting discrimination.
¶ 109 Using this approach, I would hold that (a) laws and policies that make people’s rights dependent on gender or sexual orientation violate the inviolable human dignity clause of Article II, Section 4; (b) classifications of persons on the basis of gender or sexual orientation are sex-based and are therefore arbitrary and suspect under conventional equal protection analysis; and, in what I believe to be a better view, (c) reading Article II, Sections 4 and 34 together, it is appropriate to establish, as a matter of Montana Constitutional law, that classifications based on gender or sexual orientation are suspect classifications in their own right in addition to those enumerated in the third clause of this State’s equal protection provision. I would also hold that laws and policies which are based on gender or sexual orientation are subject to strict scrutiny/compelling state interest analysis and that under that analysis, the Respondents’ policy at issue here fails.
¶110 Indeed, in this approach we give real meaning to the plain language and to the spirit of Article II, Section 4 and we realize the Constitutional Convention’s charge under Article II, Section 34 that our decisions become a crucial part of the effort to revitalize the state government’s approach to civil liberties questions-civil liberties that “We the people” are, without exception, entitled to enjoy.
*181 ¶111 With this additional rationale, I concur in our Opinion.

 We adopt Appellants’ use of the term “gay” to mean lesbians, gay men and bisexual people.

 U.S. Census Bureau, United States Census 2000, Married - Couple and Unmarried-Partner Households: 2000 4 (February 2003), at http://www.census.gov/prod/2003pubs/censr-5.pdf; David Smith and Gary Gates, Gay and. Lesbian Families in the United States: Same-Sex Unmarried Partner Households 2 (August 2001), at http://www.hrc.org/Content/ContentGroups/Publicationsl/census.pdf (hereinafter Smith).

 See Smith, at n.2.

 See also Bureau of Justice Statistics, Hate Crimes Reported in NIBRS 1997-99 (Sept. 2001), at http://www.ojp.gov/bjs/pub/pdi7hcrn99.pdf (homosexuals face disproportionate levels of bias-motivated violence and harassment).

 See Human Rights Campaign Foundation, Employers that Offer Domestic Partner Health Benefits, at http://www.hrc.org/Template.cfm7SectkHniWork_Life (then access through “Domestic Partner Benefits” and “quick lists”).

 See, for example, KPMG Peat Marwick, Health Benefits in 1997, Executive Summary 6 (June 1997); International Society of Certified Employee Benefit Specialists, Domestic Partner Benefits: Commentary, Census (May 1995), at 1 (hereinafter ISCEBS); Society for Human Resources Management, Domestic Partner Benefits Mini-Survey (1997) (hereinafter SHRM Mini-Survey)-, Hewitt Associates, Domestic Partner Benefits 2000 1, 27 (2000).

 But see Dorwart, ¶ 84 (federal constitutional decisions may neither bound nor weaken similar, but greater guarantees of individual rights afforded by Montana’s Constitution).

 But see Walker, ¶ 82, where we recognized the right of inviolable human dignity as a separate, stand-alone right.

 Gryczan was decided on privacy grounds under Article II, Section 10. Gryczan, 283 Mont. at 456, 942 P.2d at 126. However, then Chief Justice Jean A. Turnage would have reached the same result in Gryczan on the basis of equal protection. Gryczan, 283 Mont. at 456-58, 942 P.2d at 126-28 (Turnage, C.J., concurring and dissenting).

 National Center for Health Statistics, Table 3: Provisional Number ofMarriages and Divorces, at http://www.cdc.gov/nchs/data/nvsr/nvsr49/49_06_12_03.pdf and http://www.cdc.gov/nehs/data/nvsr/nvsr51/51_10_12_03.pdf.