JUSTICE NELSON,
specially concurring.
¶58 I have lived a good and a long life, and have no wish to leave this world prematurely. As death approaches from my disease, however, if my suffering becomes unbearable I want the legal option of being able to die in a peaceful and dignified manner by consuming medication prescribed by my doctor for that purpose. Because it will be my suffering, my life, and my death that will be involved, I seek the right and responsibility to make that critical choice for myself if circumstances lead me to do so. I feel strongly that this intensely personal and private decision should be left to me and my conscience-based on my most deeply held values and beliefs, and after consulting with my family and doctor-and that the government should not have the right to prohibit this choice by *253 criminalizing the aid in dying procedure.[1]
¶59 With the exception of the Court’s decision to vacate the District Court’s ruling on the constitutional issues, Opinion, ¶ 51,1 otherwise join the Court’s Opinion. For the reasons which follow, I agree with the Court’s analysis under the consent statute (§ 45-2-211, MCA), and I further conclude that physician aid in dying is protected by the Montana Constitution as a matter of privacy (Article II, Section 10) and as a matter of individual dignity (Article II, Section 4).
I. STATUTORY ANALYSIS
¶60 The Court and the Dissent offer two conflicting analyses of “public policy” under the consent statute. See Opinion, ¶¶ 14-45; Dissent, ¶¶ 99-110. In my view, the Court has the better argument. As the Court points out, the consent statute plainly contemplates that it is not against public policy in certain situations for a victim to consent to conduct that otherwise would constitute an offense under the criminal statutes. Opinion, ¶ 43. I agree with the Court that there is no indication in Montana caselaw or statutory law that physician aid in dying is against public policy. In this regard, the Dissent is incorrect in stating that the Legislature eliminated the consent defense for aiding suicide under § 45-5-105, MCA. Dissent, ¶ 105. The Dissent points to nothing in the plain language of the consent statute standing for this proposition. Rather, the Dissent relies on the uncodified 1973 Criminal Law Commission Comments to § 45-5-105, MCA. See Dissent, ¶¶ 101-103,105. Of course, these Commission Comments do not carry the weight of law. Opinion, ¶ 42. Moreover, I do not find the presumed statements of public policy reflected in these 1973 Commission Comments to be of any persuasive value here. The Legislature has since codified a different public policy in the 1985 Montana Rights of the Terminally 111 Act-specifically, that a mentally competent, incurably ill individual should have autonomy with regard to end-of-life decisions and should be afforded respect and assurance that her life-ending wishes will be honored, even if enforcement of the patient’s instructions involves a direct act by the physician (such as withdrawing life-sustaining medical treatment) which in turn causes the patient’s death. See generally Opinion, ¶¶ 27-38; Title 50, chapter *254 9, MCA.
¶61 Our decision today, therefore, provides a mentally competent, incurably ill individual with at least one avenue to end her mental and physical suffering with a physician’s assistance. Under the consent statute, it is not against public policy for the physician to provide the individual with the prescription for a life-ending substance to be self-administered by the individual at her choice of time and place. As an obvious corollary to this, the individual retains the right to change her mind as her condition progresses for better or worse-i.e., the patient retains the absolute right to make the ultimate decision of whether to take the life-ending substance. As such, in physician aid in dying the physician simply makes medication available to the patient who requests it and the patient ultimately chooses whether to cause her own death by self-administering the medicine-an act which itself is not criminal. Opinion, ¶¶ 26, 32.
¶62 I accordingly agree with the Court’s analysis and conclusion that the patient’s consent to physician aid in dying constitutes a statutory defense to a charge of deliberate homicide against the aiding physician under § 45-5-102, MCA, where the patient takes the life-ending substance and ends her life. Opinion, ¶ 50. This same conclusion, of course, applies to a charge of aiding suicide under § 45-5-105, MCA, where the patient does not take the substance. In either event, the physician is not culpable.
¶63 For these reasons, I concur in the Court’s Opinion-except, as noted, the decision to vacate the District Court’s ruling on the constitutional issues.
II. CONSTITUTIONAL ANALYSIS
¶64 Although the Court has chosen to decide this case on the narrow statutory ground suggested by the State of Montana (as an alternative approach) in its briefs on appeal, Opinion, ¶ 10, and although physician aid in dying is protected statutorily (as the Court holds under this alternative approach), physician aid in dying is also firmly protected by Montana’s Constitution. In this regard, I compliment District Court Judge Dorothy McCarter for her well-written, compassionate, and courageous-indeed, visionary-interpretation of our Constitution. The parties have extensively briefed the constitutional issues, see Opinion, ¶ 10, and the Dissent touches on them as well, see Dissent, ¶¶ 112-116. For these reasons, and because I so passionately believe that individual dignity is, in all likelihood, the most important-and yet, in our times, the most fragile-of all human *255 rights protected by Montana’s Constitution, I proceed to explain what I believe the right of dignity means within the context of this case-one of the most important cases the courts of this state have ever considered.
¶65 The District Court’s decision is grounded in both the right of individual dignity guaranteed by Article II, Section 4 and the right of individual privacy guaranteed by Article II, Section 10. Likewise, the Plaintiff-Appellee patients (Patients) and their amici present arguments under both provisions. With regard to Article II, Section 10, they persuasively demonstrate that under Gryczan v. State, 283 Mont. 433, 942 P.2d 112 (1997), and Armstrong v. State, 1999 MT 261, 296 Mont. 361, 989 P.2d 364, physician aid in dying is protected by the right of individual privacy. Indeed, this Court held in Armstrong that “the personal autonomy component of this right broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government ....” Armstrong, ¶ 75. As noted, however, I believe that this case-aid in dying so as to die with dignity-is most fundamentally and quintessentially a matter of human dignity. Accordingly, it is to that right that I direct my comments below. But before doing so, it is necessary to define and explain my choice of terms and language.
A. Terminology and Language
¶66 First, let me be clear about one thing: This case is not about the “right to die.” Indeed, the notion that there is such a “right” is patently absurd, if not downright silly. No constitution, no statute, no legislature, and no court can grant an individual the “right to die.” Nor can they take such a right away. “Death is the destiny of everything that lives. Nothing ever escapes it.”[2] Within the context of this case, the only control that a person has over death is that if he expects its coming within a relatively short period of time due to an incurable disease, he can simply accept his fate and seek drug-induced comfort; or he can seek further treatment and fight to prolong death’s advance; or, at some point in his illness, and with his physician’s assistance, he can embrace his destiny at a time and place of his choosing. The only “right” guaranteed to him in any of these decisions is the right to preserve his personal autonomy and his individual dignity, as he sees fit, in the face of an ultimate destiny that no power on earth can prevent.
*256 ¶67 Thus noted, the Patients and the class of individuals they represent are persons who suffer from an illness or disease, who cannot be cured of their illness or disease by any reasonably available medical treatment, who therefore expect death within a relatively short period of time, and who demand the right to preserve their personal autonomy and their individual dignity in facing this destiny.
¶68 In choosing this language, I purposely eschew bright-line tests or rigid timeframes. What is “relatively short” varies from person to person. I take this approach[3] for the following nonexclusive reasons. First, the amount of physical, emotional, spiritual, and mental suffering that one is willing or able to endure is uniquely and solely a matter of individual constitution, conscience, and personal autonomy. Second, “suffering” in this more expansive sense may implicate a person’s uniquely personal perception of his “quality of life.” This perception may be informed by, among other things, one’s level of suffering, one’s loss of personal autonomy, one’s ability to make choices about his situation, one’s ability to communicate, one’s perceived loss of value to self or to others, one’s ability to care for his personal needs and hygiene, one’s loss of dignity, one’s financial situation and concern over the economic burdens of prolonged illness, and one’s level of tolerance for the invasion of personal privacy and individual dignity that palliative treatment necessarily involves. Suffering may diminish the quality of life; on the other hand, the lack of suffering does not guarantee a life of quality. There is a difference between living and suffering; and the sufferer is uniquely positioned and, therefore, uniquely entitled to define the tipping point that makes suffering unbearable. Third, while most incurable illnesses and diseases follow a fairly predictable symptomatology and course, every illness and disease is a unique and very personal experience for the afflicted person. Thus, the afflicted individual’s illness or disease informs his end-of-life choices and decisions in ways unique and personal to that individual’s life, values, and circumstances. Fourth, advancements in medical treatment may become available during the period between the time when he is diagnosed as being incurably ill and the predicted (estimated) time of death. With those advancements, a person initially given three months to live may well expect to live two more months or two more years with a new medicine or treatment. Fifth, individual access to medical care may vary. A person living in proximity to a *257 medical research facility may have access to medicines and treatments as part of a clinical trial, while another person living in a sparsely populated rural area may not have that opportunity. One individual may have access to hospice care; another may not. Sadly, an insured individual may have access to medicine and treatment that an uninsured individual does not. Sixth, each individual’s family situation is different. One individual may not have close family relationships; another may have a strongly involved and supportive family. One person’s family may live within a short distance, while another person’s family may be spread across the country or around the globe. The ability to say final goodbyes and the ability to die, at a predetermined time and place, perhaps in the company of one’s partner or friends and loved ones, is important to many individuals and to their families. Seventh, and lastly, to many who are incurably ill and dying, the prospect of putting their partner or family through their prolonged and agonizing death is a source of deep emotional and spiritual distress.
¶69 Additionally, in my choice of language, I have intentionally chosen not to use emotionally charged and value-laden terms such as “terminal” and “suicide.” “Terminal” conjures up the notion that the individual is on some sort of inevitable slide or countdown to death. This term trivializes the fact that many individuals, with what appear to be medically incurable diseases, nevertheless retain steadfast hope and faith that their condition will be reversed, along with a personal resolve to fight for life until the very end. Labeling an individual as “terminal” may not only discourage the individual from seeking treatment but may also discourage further treatment efforts by healthcare providers. A “terminal” diagnosis fails to acknowledge that medicine usually cannot predict the time of death with the sort of exactitude that the use of the term connotes.
¶70 Similarly, the term “suicide” suggests an act of self-destruction that historically has been condemned as sinful, immoral, or damning by many religions. Moreover, in modern parlance, “suicide” may be linked with terrorist conduct. Importantly, and as reflected in the briefing in this case, society judges and typically, but selectively, deprecates individuals who commit “suicide.” On one hand, the individual who throws his body over a hand grenade to save his fellow soldiers is judged a hero, not a person who committed “suicide.” Yet, on the other hand, the individual who shoots herself because she faces a protracted illness and agonizing death commits “suicide” and, as such, is judged a coward in the face of her illness and selfish in her *258 lack of consideration for the pain and loss her act causes to loved ones and friends. Assisting this person to end her life is likewise denounced as typifying “ ‘a very low regard for human life.’ ” Dissent, ¶ 118 (quoting the Commission Comments to § 45-5-105, MCA). To the contrary, however, the Patients and their amici argue that a physician who provides aid in dying demonstrates compassionate regard for the patient’s suffering, recognition of the patient’s autonomy and dignity, and acknowledgement of death’s inevitability.
¶71 “Suicide” is a pejorative term in our society. Unfortunately, it is also a term used liberally by the State and its amici (as well as the Dissent) in this case. The term denigrates the complex individual circumstances that drive persons generally-and, in particular, those who are incurably ill and face prolonged illness and agonizing death-to take their own lives. The term is used to generate antipathy, and it does. The Patients and the class of people they represent do not seek to commit “suicide.” Rather, they acknowledge that death within a relatively short time is inescapable because of their illness or disease. And with that fact in mind, they seek the ability to self-administer, at a time and place of their choosing, a physician-prescribed medication that will assist them in preserving their own human dignity during the inevitable process of dying. Having come to grips with the inexorability of their death, they simply ask the government not to force them to suffer and die in an agonizing, degrading, humiliating, and undignified manner. They seek nothing more nor less; that is all this case is about.
¶72 Finally, I neither use the terms nor address “euthanasia” or “mercy killing.” Aside from the negative implications of these terms and the criminality of such conduct, the Patients clearly do not argue that incompetent, nonconsenting individuals or “vulnerable” people may be, under any circumstances, “euthanized” or “murdered.” To read their arguments as suggesting either is, in my view, grossly unfair and intellectually dishonest. The only reason that “homicide” is implicated at all in this case is because (a) the State contends that a licensed physician who provides a mentally competent, incurably ill patient with the prescription for a life-ending substance, to be self-administered by the patient if she so chooses, is guilty of deliberate homicide and (b) our decision holds that it is not against public policy under the consent statute to permit the physician to do so.
¶73 With that prefatory explanation, I now turn to Article II, Section 4 and the right of individual dignity.
B. Construction of Article II, Section 4
¶74 Article II, Section 4 of Montana’s 1972 Constitution provides:
*259 Individual dignity. The dignity of the human being is inviolable. No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas.
While there are differing interpretations of this language, which I note below, it is my view that the first clause of Article II, Section 4 (the Dignity Clause) is a stand-alone, fundamental constitutional right. See Walker v. State, 2003 MT 134, ¶¶ 74, 82, 316 Mont. 103, 68 P.3d 872 (explaining that the rights found in Article II are “fundamental” and that the plain meaning of the Dignity Clause “commands that the intrinsic worth and the basic humanity of persons may not be violated”).
¶75 First, I categorically reject the notion that the Dignity Clause is merely some “aspirational introduction” to the equal protection and nondiscrimination rights which follow it-a proposition for which there is no authority. Our Constitution is “a limitation upon the powers of government,” Cruse v. Fischl, 55 Mont. 258, 263, 175 P. 878, 880 (1918), and in construing a constitutional provision, we are required “to give meaning to every word, phrase, clause and sentence therein, if it is possible so to do,” State ex rel. Diederichs v. State Highway Commn., 89 Mont. 205, 211, 296 P. 1033, 1035 (1931). Accordingly, the command that “[t]he dignity of the human being is inviolable” must be acknowledged as the freestanding limitation it is on the power of the government-much in the same way we recognize that trial by jury, which is similarly “inviolate” (Mont. Const, art. II, § 26), is not merely “aspirational” but is in fact a concrete right guaranteed by the Constitution.
¶76 Second, I likewise reject the notion that the right of dignity is fully implemented by the Equal Protection and Nondiscrimination Clauses or that these clauses are the sole “operative vehicles” for achieving dignity. In other words, I cannot agree that the inviolable dignity of a human being is infringed only when the person is denied equal protection of the laws or suffers discrimination for exercising his or her civil or political rights. Indeed, such an interpretation of Article II, Section 4 attributes an implausibly narrow meaning to the term “dignity.” As the Dissent notes, the Dignity Clause can be traced to West Germany’s 1949 Constitution, which was developed in response to the Nazi regime’s treatment of the Jewish people (as well as homosexuals, Gypsies, persons with disabilities, and political *260 opponents). Dissent, ¶ 116 n. 4. These “inferior” people (so-called “useless eaters”[4]) were not merely denied equal protection of the laws. The government placed them in concentration camps and used them for slave labor. Medical experiments were performed on them. They were persecuted and killed. They were viewed and treated as subhuman, without any dignity. The West German Constitution and its command that “[t]he dignity of man shall be inviolable” must be understood in this context. Doing so, it simply cannot be maintained that Article II, Section 4 prohibits only discrimination and the denial of equal protection. The Dignity Clause broadly prohibits any law or act that infringes upon our inviolable dignity as human beings. This is not some “vague, lurking” right as the Dissent suggests. Dissent, ¶ 116. Rather, it is an imperative; an affirmative and unambiguous constitutional mandate.
¶77 This interpretation is supported by the structure of Article II, Section 4. In this connection, I agree with the construction proffered by Matthew O. Clifford and Thomas P. Huff in their article Some Thoughts on the Meaning and Scope of the Montana Constitution’s ‘Dignity” Clause with Possible Applications , 61 Mont. L. Rev. 301, 305-07 (2000). They point out that the language of Article II, Section 4 (which is titled “Individual Dignity”) moves in a logical progression from the general to the specific. The first sentence (the Dignity Clause) declares that human dignity is inviolable. The second sentence (the Equal Protection Clause) goes on to declare one way in which human dignity can be violated: by denying someone the equal protection of the laws based on some sort of arbitrary classification. They observe that our legal tradition has long recognized such classifications as affronts to the dignity of persons (citing as an example of this Brown v. Board of Education, 347 U.S. 483, 74 S. Ct. 686 (1954)). Finally, the third sentence (the Nondiscrimination Clause) fleshes out the meaning of the equal protection right by enumerating certain types of classifications which the framers of Article II, Section 4 believed to be arbitrary: race, color, sex, culture, social origin or condition, and political or religious ideas.
¶78 Clifford and Huff note that the classifications identified in the Nondiscrimination Clause cannot be read as an exhaustive list of all possible arbitrary classifications. Otherwise, if the list were *261 exhaustive, the Equal Protection Clause would be surplusage. The more reasonable interpretation, they conclude, is that by including the separate and more general Equal Protection Clause, the framers intended to leave open the possibility that there are other prohibited classifications beyond those which were recognized at that point in history (i.e., in 1972). And by the same logic, the inclusion of a more general prohibition against the violation of human dignity leaves open the possibility that human dignity can be violated in ways that do not involve some sort of arbitrary classification. Indeed, they argue, and I agree, that in order to give distinct and independent meaning to the Dignity Clause, avoiding redundancy, “this clause should be applied separately when there is a violation of the dignity of persons that does not reflect the forms of unequal treatment or invidious discrimination prohibited by the two subsequent clauses. Presumably anyone could experience such a violation of dignity, not just persons who are members of protected classes.”[5] Clifford and Huff, 61 Mont. L. Rev. at 306-07.
¶79 This interpretation is consistent with the debate on Article II, Section 4 at the 1971-1972 Constitutional Convention.[6] During the debate, Delegate Jerome T. Loendorf inquired whether the express prohibition against discrimination was necessary, given that the right of equal protection already prohibits discrimination. Delegate Wade J. Dahood (chair of the Bill of Rights Committee) acknowledged that the Nondiscrimination Clause was “subsumed in” the Equal Protection Clause, but he explained that “when we’re dealing with this type of right, Delegate Loendorf, and we are dealing with something that is this basic, to an orderly and progressive society perhaps sometimes the *262 sermon that can be given by constitution, as well as the right, becomes necessary.” Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, pp. 1643-44. Thus, the delegates decided that it was preferable to include the additional language making certain facets of the equal protection right explicit. This same principle supports the notion that denying someone the equal protection of the laws is but one way in which human dignity can be violated, as discussed above.
¶80 In arguing against this interpretation of Article II, Section 4, the Dissent points to Delegate Dahood’s statement that “[t]here is no intent within this particular section to do anything other than to remove the apparent type of discrimination that all of us object to with respect to employment, to rental practices, to actual associationship in matters that are public or matters that tend to be somewhat quasi-public.” Montana Constitutional Convention, Verbatim Transcript, Mar. 7,1972, p. 1643. This statement, however, must be understood in context. Dahood was not purporting to limit the scope of Article II, Section 4. In fact, he was trying to keep the provision broad. Delegate Otto T. Habedank had voiced a concern that the language “any person, firm, corporation, or institution” in the Nondiscrimination Clause would prohibit private organizations from limiting their membership and would force individuals to associate with people they otherwise would choose not to associate with. See Montana Constitutional Convention, Verbatim Transcript, Mar. 7, 1972, p. 1643. Habedank therefore had moved to delete the “any person, firm, corporation, or institution” language from the Nondiscrimination Clause, thereby rendering the clause applicable to only the state. See Montana Constitutional Convention, Verbatim Transcript, Mar. 7,1972, p. 1642. Dahood, in turn, argued against this amendment (which ultimately was defeated 76 to 13) and in favor of applying the nondiscrimination prohibition to entities other than the state, such as employers, landlords, and public or quasi-public associations. Dahood made no remarks about the Dignity Clause itself.
¶81 In contrast, Delegate Proposal No. 33 specifically recognized an independent right of individual dignity. It stated: “The rights of individual dignity, privacy, and free expression being essential to the well-being of a free society, the state shall not infringe upon these rights without the showing of a compelling state interest.” See Montana Constitutional Convention, Delegate Proposals, Jan. 26, 1972, p. 127. This proposal was referred to the Bill of Rights Committee, which adopted the proposal in its entirety. See Montana Constitutional Convention, Bill of Rights Committee Proposal, Feb. 23, *263 1972, p. 647. The right of individual dignity, the right of privacy, and the right of free expression were then incorporated, respectively, into Sections 4, 10, and 7 of Article II.[7]
¶82 In sum, given the plain language of Article II, Section 4 and the structure of this provision, I conclude that the Dignity Clause-stating that the dignity of the human being is inviolable-is a stand-alone, fundamental constitutional right. This conclusion is supported by the record from the Constitutional Convention. I now turn to the substance of this right.
C. The Right of Human Dignity
¶83 Human dignity is, perhaps, the most fundamental right in the Declaration of Rights. This right is “inviolable,” meaning that it is “[s]afe from violation; incapable of being violated.” Black’s Law Dictionary 904 (Bryan A. Garner ed., 9th ed., West 2009) (emphasis added). Significantly, the right of human dignity is the only right in Montana’s Constitution that is “inviolable.”[8] It is the only right in Article II carrying the absolute prohibition of “inviolability.” No individual may be stripped of her human dignity under the plain language of the Dignity Clause. No private or governmental entity has the right or the power to do so. Human dignity simply cannot be violated-no exceptions. Snetsinger v. Montana University System, 2004 MT 390, ¶ 77, 325 Mont. 148, 104 P.3d 445 (Nelson, J., specially concurring).
¶84 But what exactly is “dignity”? It would be impractical here to attempt to provide an exhaustive definition. Rather, the meaning of this term must be fleshed out on a case-by-case basis (in the same way that the parameters of substantive due process have been determined on a case-by-case basis). I note, however, a couple of interpretations that are useful for purposes of the present discussion. Law professor *264 Raphael Cohen-Almagor states that the concept of dignity “refers to a worth or value that flows from an inner source. It is not bestowed from the outside but rather is intrinsic to the person.” Raphael Cohen Almagor, The Right to Die with Dignity, 17 (Rutgers University Press 2001). He argues that “[t]o have dignity, means to look at oneself with self-respect, with some sort of satisfaction. We feel human, not degraded.” Cohen-Almagor, The Right to Die with Dignity at 17. Similarly, Clifford and Huff explain that in our Western ethical tradition, especially after the Religious Reformation of the 16th and 17th centuries, dignity has typically been associated with the normative ideal of individual persons as intrinsically valuable, as having inherent worth as individuals, at least in part because of their capacity for independent, autonomous, rational, and responsible action. Clifford and Huff, 61 Mont. L. Rev. at 307. Under this conception, dignity is directly violated by degrading or demeaning a person. Clifford and Huff, 61 Mont. L. Rev. at 307; see also e.g. Walker v. State, 2003 MT 134, ¶¶ 81-84, 316 Mont. 103, 68 P.3d 872 (recognizing this principle and holding that the correctional practices and living conditions to which Walker was subjected at the Montana State Prison violated his right of human dignity). Or dignity is indirectly violated by denying a person the opportunity to direct or control his own life in such a way that his worth is questioned or dishonored. For example, dignity could be indirectly undermined “by treatment which is paternalistic-treating adults like children incapable of making autonomous choices for themselves, or by trivializing what choices they do make about how to live their lives.” Clifford and Huff, 61 Mont. L. Rev. at 307-08; cf. Cruzan v. Director, Missouri Dept. of Health, 497 U.S. 261, 289, 110 S. Ct. 2841, 2857 (1990) (O’Connor, J., concurring) (requiring a competent adult to endure the procedures of being fed artificially by means of a tube against her will “burdens the patient’s liberty, dignity, and freedom to determine the course of her own treatment”). Significantly, this Court has held that “[rjespect for the dignity of each individual... demands that people have for themselves the moral right and moral responsibility to confront the most fundamental questions about the meaning and value of their own lives and the intrinsic value of life in general, answering to their own consciences and convictions.” Armstrong v. State, 1999 MT 261, ¶ 72, 296 Mont. 361, 989 P.2d 364.
¶85 Clifford and Huff also point out that if the Dignity Clause is to maintain its force as a shared public ethical norm,
the substantive meaning of the clause must not be identified with, *265 or justified by, any specific controversial religious or philosophical doctrines. The only reasonable political compromise we can reach in modern times (after the Reformation), when we must accept as fact that different segments of society will have deeply conflicting personal, religious, and philosophical views about how one ought to live one’s life, is to agree to treat each other, and our respective values, with mutual respect and tolerance. This compromise makes possible the modern constitutional democracy, focused on securing the liberty and protecting the dignity of each person. Thus, the only conception of dignity that we can all share as citizens, despite our other differences, in a post-Reformation state (the conception of dignity that, for example, the delegates to the Constitutional Convention could share), must focus on honoring the worth of autonomous individuals. To remain consistent with this shared, public ideal of dignity, the right to treatment with dignity must not be defined according to some parochial, sectarian religious or some controversial, philosophical notion of human dignity-those richer conceptions of dignity about which we have agreed to disagree.
Clifford and Huff, 61 Mont. L. Rev. at 326-27 (footnote omitted).
¶86 Given its intrinsic nature, it is entirely proper, in my view, that the right of dignity under Article II, Section 4 is absolute. Indeed, human dignity transcends the Constitution and the law. Dignity is a fundamental component of humanness. It is inherent in human self-consciousness. Dignity belongs, intrinsically, to our species-to each of us-as a natural right from birth to death. It permeates each person regardless of who that person is or what he does. It cannot be abrogated because of one’s status or condition. While the government may impinge on privacy rights, liberty interests, and other Article II rights in proper circumstances (e.g., when one becomes a prisoner), the individual always retains his right of human dignity. So too with persons suffering from mental illness or disability and involuntary commitment: Each retains the right to demand of the State that his dignity as a human being be respected despite the government’s sometimes necessary interference in his life.
¶87 I am convinced that each of us recognizes this intrinsic, elemental nature of human dignity. Indeed, that recognition explains why we collectively recoil from the pyramid of naked enemy soldiers prodded by troops with guns and dogs at Abu Ghraib; why disgust fills most of us at the descriptions and depictions of water boarding and torture; and why we revolt from ethnic cleansing and genocide. It is why we *266 should collectively rebel, as well, when we see our fellow human beings in need from lack of food, clothing, shelter, medical care, and education.
¶88 Experience teaches, and we understand innately, that once we strip an individual of dignity, the human being no longer exists. A subhuman is easy to abuse, torture, and kill, because the object of the abuse is simply that-an object without worth or value and devoid of the essential element of humanness: dignity. Six million Jewish people, along with homosexuals, Gypsies, and persons with disabilities stand as mute testament to what happens when human beings are stripped of their dignity.
¶89 I believe this is why we also collectively recoil from accounts of our fellow human beings forced to endure the humiliation and degradation of an agonizing death from an incurable illness.[9] Pain may, in theory, *267 be alleviated to the point of rendering the person unconscious. But in those circumstances, we still cannot deny that the individual’s human dignity has been dealt a grievous blow long before death claims her body. Indeed, in response to the State’s argument that palliative care is a reasonable alternative to physician aid in dying, Mr. Baxter explained:
I am appalled by this suggestion and the loss of personal autonomy it involves. I understand that terminal or palliative sedation would involve administering intravenous medication to me for the purpose of rendering me unconscious, and then withholding fluids and nutrition until I die, a process that may take weeks. During this final period of my life I would remain unconscious, unaware of my situation or surroundings, unresponsive from a cognitive or volitional standpoint, and uninvolved in my own death. My ability to maintain personal hygiene would be lost and I would be dependent on others to clean my body. My family would be forced to stand a horrible vigil while my unconscious body was maintained in this condition, wasting away from starvation and dehydration, while they waited for me to die. I would want to do whatever I could to avoid subjecting my family to such a painful and pointless ordeal.
While the option of terminal sedation might be acceptable to some individuals-and I respect the right of others to choose this course if they wish to do so-it is abhorrent to me. The notion that terminal sedation should be the only option available to me if my suffering becomes intolerable is an affront to my personal values, beliefs and integrity. I have always been an independent and proud individual, and consider this form of medical treatment to be dehumanizing and humiliating. I feel strongly that my privacy, dignity and sense of self-autonomy will be forfeit if my life has to end in a state of terminal sedation.
Supp. Aff. Robert Baxter ¶¶ 3-4 (Aug. 25, 2008).
¶90 New of us would wish upon ourselves or upon others the prolonged dying that comes from an incurable illness. And it is for this reason that some of our fellow human beings demand-rightfully, in my view-that we respect their individual right to preserve their own human dignity at a time when they are mentally competent, incurably *268 ill, and faced with death from their illness within a relatively short period of time.
¶91 The State asserts that it has compelling interests in preserving life and protecting vulnerable groups from potential abuses. This broad assertion, however, is entirely inadequate to sustain the State’s position in opposition to physician aid in dying. We are dealing here with persons who are mentally competent, who are incurably ill, and who expect death within a relatively short period of time. The State has failed to explain what interest the government has in forcing a competent, incurably ill person who is going through prolonged suffering and slow, excruciating physical deterioration to hang on to the last possible moment. Moreover, the State has not come close to showing that it has any interest, much less a “compelling” one, in usurping a competent, incurably ill individual’s autonomous decision to obtain a licensed physician’s assistance in dying so that she might die with the same human dignity with which she was born. In point of fact, the State’s position in this appeal is diametrically in opposition to the public policy reflected in the Montana Rights of the Terminally 111 Act: that a mentally competent, incurably ill individual should have autonomy with regard to end-of-life decisions and should be afforded respect and assurance that her life-ending wishes will be honored.
¶92 Furthermore, it must be remembered that an individual’s right of human dignity is inviolable; it is incapable of being violated. Thus, there is absolutely no merit to the State’s suggestion that it may strip a human being of his dignity in order to satisfy an interest that the government believes is “compelling.” The right of dignity is absolute, and it remains absolute even at the time of death. It may not be stripped from the individual by a well-meaning yet paternalistic government. Nor may it be stripped by third parties or institutions driven by political ideology or religious beliefs. Cf. Clifford and Huff, 61 Mont. L. Rev. at 330 (“To be forced into degrading or dehumanizing pain or suffering because of someone else’s conception of a good or proper death exacerbates the loss of dignity....”). Dignity defines what it means to be human. It defines the depth of individual autonomy throughout life and, most certainly, at death. Usurping a mentally competent, incurably ill individual’s ability to make end-of-life decisions and forcing that person against his will to suffer a prolonged and excruciating deterioration is, at its core, a blatant and untenable violation of the person’s fundamental right of human dignity.
*269 III. CONCLUSION
¶93 In conclusion, while I join the Court’s decision, I also would affirm the District Court’s ruling on the constitutional issues. I agree with the Court’s statutory analysis, but I also agree with Judge McCarter that physician aid is dying is firmly protected by Article II, Sections 4 and 10 of the Montana Constitution. Under these sections, individuals who are mentally competent and incurably ill and face death within a relatively short period of time have the right to self-administer, at a time and place of their choosing, a life-ending substance prescribed by their physician. The physician simply makes the medication available to the patient who requests it and the patient ultimately chooses whether to cause her own death by self-administering the medicine.
¶94 This right to physician aid in dying quintessentially involves the inviolable right to human dignity-our most fragile fundamental right. Montana’s Dignity Clause does not permit a person or entity to force an agonizing, dehumanizing, demeaning, and often protracted death upon a mentally competent, incurably ill individual for the sake of political ideology, religious belief, or a paternalistic sense of ethics. Society does not have the right to strip a mentally competent, incurably ill individual of her inviolable human dignity when she seeks aid in dying from her physician. Dignity is a fundamental component of humanness; it is intrinsic to our species; it must be respected throughout life; and it must be honored when one’s inevitable destiny is death from an incurable illness.
¶95 I specially concur.

 Aff. Robert Baxter ¶ 9 (June 28, 2008). Baxter (one of the plaintiffs-appellees in this case) died of leukemia on December 5,2008-the same day the District Court issued its ruling in his favor, holding that under the Montana Constitution a mentally competent, incurably ill patient has the right to die with dignity by obtaining physician aid in dying.

John Shelby Spong, Eternal Life: A New Vision, 73 (HarperCollins 2009).

 See generally Raphael Cohen-Almagor, The Right to Die with Dignity, 27-33, 52-79, 96-112 (Rutgers University Press 2001).

 George J. Annas, The Man on the Moon, Immortality, and other Millennial Myths: The Prospects and Perils of Human Genetic Engineering, 49 Emory L.J. 753, 758 (2000).

 Such is the case here, and that fact distinguishes my analysis herein from my analysis in Snetsinger v. Montana University System, 2004 MT 390, 325 Mont. 148, 104 P.3d 445. Snetsinger involved discrimination and equal protection issues relating to sexual orientation. Thus, applying Clifford and Huff’s analytical model, I analyzed these issues under each sentence of Article II, Section 4. See Snetsinger, ¶¶ 71-97 (Nelson, J., specially concurring). The present case, however, does not involve discrimination or equal protection claims. It is appropriate, therefore, to apply only the Dignity Clause, as a stand-alone constitutional protection.

 I acknowledge that the intent of the framers should be determined from the plain meaning of the words used and, if that is possible (as it is here), then we apply no other means of interpretation. Indeed, “[w]e are precluded . . . from resorting to extrinsic methods of interpretation.” Great Falls Tribune Co. v. Great Falls Public Schools, 255 Mont. 125, 128-29, 841 P.2d 502, 504 (1992) (internal quotation marks omitted). The Dissent, however, relies on the Constitutional Convention record. Dissent, ¶¶ 112-116. Thus, I discuss this record for purposes of responding to the Dissent’s arguments.

 In this regard, the Dissent points out that the Bill of Rights Committee did not adopt Delegate Robert L. Kelleher’s Proposal No. 103, which stated: “Ahúman fetus has the right to be born. The incurably ill have the right not to be kept alive by extraordinary means.” See Dissent, ¶¶ 113-115. Of course, we are not dealing in this case with “the right not to be kept alive by extraordinary means”-a matter already addressed statutorily by the Montana Rights of the Terminally 111 Act (Title 50, chapter 9, MCA). Moreover, the reasons behind the committee’s decision on Proposal No. 103 are not stated in the Constitutional Convention record, and this Court has already rejected a similar attempt to read more than is warranted into the disposition of this proposal (see Armstrong v. State, 1999 MT 261, ¶¶ 43-48, 296 Mont. 361, 989 P.2d 364). In short, the disposition of Kelleher’s proposal is simply not instructive here.

 As noted, the right of trial by jury is “inviolate.” Mont. Const, art. II, § 26. “Inviolate,” however, means “[fjree from violation; not broken, infringed, or impaired,” Black’s Law Dictionary 904, which is not the same as “incapable of being violated.”

 In this regard, twelve individuals who identify themselves as “surviving family members” submitted an amicus curiae brief with attached affidavits in support of the Patients. I note two of the stories here, though each story is compelling. These stories demonstrate that the State’s “palliative care is the answer” argument has real limitations and grossly dehumanizing failures.

Richard’s Story

First, one of the surviving family members describes the death of her longtime companion, Richard, who died of Lou Gehrig’s disease:
During the last two weeks of Richard’s life, despite the conscientious efforts of his personal doctor, hospice nurses, and caregivers to provide comfort, he endured both physical and emotional pain of stunning magnitude. His mind was haunted by an acute awareness that his body was stiffening, becoming rigid, and rendering him immobile. He described a sense of being “stuck,” “trapped,” “chained to the bed,” “tied down,” “in prison.” He suffered anxiety, panic attacks, and claustrophobia. In addition, he endured severe muscle spasms, frequent episodes of shortness of breath and the fear of suffocation, swallowing difficulty, and soreness of limbs.
Richard eventually stopped eating and drinking, went into a coma, and died shortly thereafter. Notably, before his death, Richard explored various death-with-dignity options but did not find a Montana doctor willing to aid him in this manner. Aff. Doris Fischer ¶¶ 3-6 (May 11, 2009).

Betty’s Story

Second, another of the surviving family members describes the death of her sister, Betty, who died of multiple sclerosis:
[T]he ravages Betty suffered from MS left her unable to simply hold a book and to turn its pages; she could no longer hold utensils with which to feed herself; she could no longer hold up her head and, therefore, spent all the waking hours of her day slouched with her chin resting on her chest, in her wheelchair. She was essentially paralyzed. Because swallowing was nearly impossible, she could choke while attempting to swallow even the slightest bit of liquid or puréed foods. Her body would endure terrible, even violent and uncontrollable spasms. One of those spasms actually threw her from the confines of her wheelchair and resulted in a broken femur. Additionally, she had obscenely huge bed sores, as a result of her incapacity to move, as well as the fact that her body’s protein was breaking down____[T]hese bedsores were so large in some areas of her body that her bones were visible. It was an absolute nightmare for both of us-for her to bear, and for me to treat.
Betty made plans to move to Oregon, but she had to be hospitalized because of her *267 broken femur. “She was painfully wasting away and was exhausted-beyond imagination.” Although Betty was a stoic person, she often pleaded with her sister: “This is no life and I cannot stand it.” She ultimately slipped into a coma and died shortly thereafter. Aff. Mary Fitzgerald ¶¶ 3-6 (May 12, 2009).